The first case for argument this morning is 18-1691 Idenix Pharmaceuticals v. Gilead. Good morning. Chief Judge Prost, and may it please the court. Idenix's patent was a game-changing invention for the treatment of hepatitis C. It's a method of treating that virus with a ribonucleosides. The industry immediately followed in the wake of the disclosure of this patent by making different kinds of those two-prime methyl up ribonucleosides and it stopped hepatitis C the virus in its tracks. And what stops it is the two-prime fluoro down? That is the commercial embodiment of Gilead's product, that's correct, but that's not the only embodiment that stops it. And in fact, what I'm going to tell the court, Chief Judge Prost, is that there are two paths to reversal in this case and both of them show that the quid pro quo of the patent system worked in this case. The first path has to do with the Rule 50 violations that we've set forth in our brief and the second has to do with the district court's misapplication of the law as requiring a person of ordinary skill to make every embodiment within the claims. Now if I could start by begging the court's indulgence, because we have a jury verdict here and Gilead had a clear and convincing evidence standard, there we have to look to see what implied facts the jury found in this case that are supported by the evidence. There are eight. They're one sentence. I don't know how much time we have to cover the eight. Can you talk to me about the numbers? What is your number in terms of the potential number of compounds here? So first of all, that's a question you might better ask my friend on the other side because it was their burden to prove. The court said the number was enough with regard to the clear and convincing evidence standard. It may have said it was unclear. It started at billions and it whittled it down to tens of thousands. He starts with billions and then whittles it down using the what he calls the refined structural limitations to tens of thousands. But what do those numbers represent? Those represent which ones of the two prime methyl upribonucleosides work. And that goes to one of the things that the jury could have found here. The jury could have found that every two prime methyl. Can we go back to my question about the numbers? What is your position about what number the jury must have relied on or did rely on or could have relied on? What is the number we're talking about? Well all I can tell you, your honor, is that the district court in this case said that the number that the jury could have relied on was in the thousands. But he said the number was unclear. But he said it was unclear as to whether it was a lot more than that, not a lot less than that. That's right. But here's the point. That's important. Well it is important. But what's important about the number is which ones of them work. Which ones of them actually work? Well what's also important about the number is how fast you can get through them. Well that's why I want to go to the facts. Because I think that before I can have a coherent discussion with you, and I can do this very quickly, and I'm not going to overstate the record. I'll have citations for you. But you said what matters is what it works. But you have to screen and synthesize to see what works. Are you claiming? No you don't have to. What do you mean what it works? What is claimed here? You have to enable the full scope of the claim. Yes absolutely. I really am trying to answer the court's question. I'm not trying to avoid it at all. Okay and I'm just still looking for a number. You're trying to defend a jury verdict. Right. And we want to put ourselves in the place of the jury and see what number they were working with. Do you accept the judge, you said the district court said it was unclear. Yeah as Judge Wallach pointed out whether it was tens of thousands of reaching up to I can only go by what the what the judge said and say that it's in the thousands. If I accept that. Okay so you're accepting tens of thousands. I accept it for purposes of argument because I don't believe we have any burden here whatsoever. It's not a matter of burden. We're trying to evaluate the basis for the jury's decision. Yes. They heard all of the evidence. We've got to credit your evidence in that regard. If we're trying to discern what number, what universe we're talking about, then we've got to have in our mind the number. If you agree with us that we can accept the district court's analysis in that regard, that's fine. That answers my question. Well I will accept it for purposes of argument because then what we now know if it's thousands is that you can screen thousands instantaneously. And screening is not an impediment to enablement. Juan says that. Atlas Powder says that. Judge Bryson's EuroPEP opinion which was affirmed by this court under Rule 36 says that screening, the question at that point is, is screening undue experimentation? The evidence in this case was that even if you assume that you were dealing with a universe of thousands, screening would have been easy. Are you also assuming they're all in the library? You don't have to do any synthesis? No but let me again go to what the jury could have found here. The jury could have found that Identix's patent directed a person of ordinary skill and the art to focus on the HCV polymerase. I'll give you citations to each of these if you want but I'm just going to go through them quickly. The jury could have found that Identix's patent directed a person of ordinary skill and the art that to methyl up ribonucleosides, which is all we've claimed, the method using those ribonucleosides predictably terminate the chain of the hepatitis C virus by attacking at the NS5B point. Third, the jury could have concluded that all two prime methyl ribonucleosides were active against the hepatitis C virus so that the numbers don't matter. Screening was irrelevant. In fact, the patent calls screening merely confirmatory. Fourth, if any screening... Can I just ask you about that? You're saying that they were all effective and that's because they all could have been screened? Because they all were screened? No. The reason for that is the testimony of Mr. Clark and Dr. Somodosy. Mr. Clark at A7311 said, and I quote, I can say for certain that I knew the two prime up methyl ribonucleosides were active against HCV. He also believed that his own embodiment, which was the fluoro down embodiment, would have anti-HCV activity. Wait a minute. There's some testimony at 37441 where your expert says you don't know whether or not a nucleoside will have activity against HCV until you make it and test it. That's right with regard to absolute confirmatory screening, yes. That's the only thing that that can be understood to say. What I don't mean... You used the word absolute confirmatory. You don't know whether or not it works. That's what we're supposed to be looking at. For clinical purposes, that's absolutely right. You've got to screen before you put anything into clinical trials. But that's not the enablement standard. The FDA clinical trial standard is not the enablement standard. The simple question is, does this patent enable a person of ordinary skill? And the answer is yes. Let me just give you a couple... And what is the connection between that and whether it works or not for the intended purpose and the claimed purpose, which is HCV? Right. The point is that the jury could have concluded that every two prime up ribonucleoside was effective against HCV. So you don't need any testing, any screening... Screening is only confirmatory and it only confirms so that you get it into the lab and you know it for sure. Okay. And can you tell me what that testimony is again? Sure. Let me start with Mr. Clark at A7311 where he says, and this is their witness, I can say for certain that I knew that two prime methyl nucleosides were active against HCV. He also says three pages later at A7314 that he believed his embodiment would have anti-HCV activity before he made it because, quote, that's what it's made for. This was, by the way, recognized as a fact dispute by Gilead's own lawyer. And that's at A37830. He says in closing, Dr. Somodosy told you all two prime up methyl ribonucleosides would be effective. There's a conflict in the evidence. You should believe our witness. The jury didn't believe that. The Dr. Somodosy's testimony there, by the way, can also be found at A737085. He testifies, quote, any two prime methyl ribonucleoside would be active against the hepatitis C virus, end quote. That's proposition three. Four was my point earlier. If any screening was necessary, it would have been quick and easy. But Idenix's patent disclosed that substitutions could be made at any position, including the two prime down position, without affecting the expected activity. That's Appendix 80, Column 22 of the patent. Also Gilead's concession at the beginning of the Rule 50 motion in the trial court where he said that all OH down embodiments were enabled. So the discussions about anything at any of the other positions other than two prime down should be out of this case. We're also in a very established art, nucleoside chemistry. Nucleoside chemistry had been established for over 30 years. Mr. Clark himself said you could always make any compound you wanted to make. It was routine and a very developed science. Number seven, persons of ordinary skill knew that nucleosides were regularly used as chain terminators for other hepatitis B and herpes. So we would have to conclude that based on the specification, which eventually, if you work your way through, you finally get to the two prime F down substituent in a different context, that that aspect is, all of that is irrelevant, as long as it's a two prime up methyl. That's our invention in this case is two prime methyl up. It doesn't matter what's at the down position. It doesn't matter how much you claim. It matters exactly how much we claim because our specification and our enabled is absolutely commensurate with the full scope of that claim. This is what I'm trying to establish to you. When you look at it, when you look at it, at all of the examples which include halogen, they don't include fluorine until you get to at the very end. That is just chlorine, bromine. And from that, can one draw some sort of inference that at least the two prime down F was not contemplated? No, you can't draw that inference. As you yourself just said, Judge Newman, those are examples. Specification and the examples are not meant to be limiting. And the argument that was made and rejected at claim construction, it then became resurrected in the trial. But remember that the enablement here is not to enable a two prime fluoro down embodiment. It's to enable the full scope of the claims. And the claims are two prime methyl up. Well, it must include the two fluoro down because that's the accused product. So it's got to include it and it's got to enable it, right? Well, it's got to enable it in the sense that a claim to a genus like this one is, at least with regard to the chemical used in the method of treatment, has to enable the full scope. But it also does enable fluorine. And it enables fluorines for pretty much all the reasons, Judge Newman, that you pointed out. And in fact- So is it your view that all of the thousands were at least on the same, at least thousands? So all of those are effective for hepatitis C? It is my view that a jury could have concluded that based on the testimony here. And I want to remind the court of a couple of things here. Well, hang on. Because I have some questions. I'd let you run through your eight. OK. Thank you. On page 53 of the blue brief, you talk about phantom statements by the district court. On 53, you say, the district court also cited a purported admission from Dr. Meyer, and you discuss it, that, quote, that not all compounds of interest were commercially available. The district court miscited a page. Did Dr. Meyer ever make that statement? We say that Dr. Meyer never made such a statement, and the source was actually from Gilead's Dr. Seacrest.  Well, it was the lawyer who misattributed it to Dr. Meyer, as we say here on the page. But that statement was made, wasn't it? The statement was made, yes. But it was part of- It wasn't a phantom statement. If the claim is made that we've over-claimed with regard to that being a phantom statement, I'll apologize to the court. I think you should. You should apologize to the district court for that. Well, but the larger point here is that the district court did, on Rule 50, resolve factual disputes. And Chief Judge Prost, with regard to your previous question there about the- or actually, I think it was Judge Newman also, about the path through the patent, I also want to point you to Mr. Clark and Dr. Otto's testimony, where the district court said there was no evidence that a reasonable jury could have concluded that Clark actually used our patent in order to track right down to the floral embodiment. The evidence is actually to the contrary. Dr. Otto testified at page A37322, not only that Mr. Clark had the patent when he came to him with his idea to make a floral down embodiment, but he showed him the path through. They were looking for what they were calling a loophole. And remember, they had the specification, but not the claims. And they see that in these examples, all of these other halogens, but not fluorine, are mentioned there. So they go, aha, we think we found a loophole. They were wrong. And that shows, by the way, how the patent enables. It took this person of subordinary skill right to the embodiment that he actually made. Now, of course- But you have to enable the entire scope. We are enabling the entire scope. But can I go back to- so to make sure I understand, your view was that based on this record, the jury could have concluded that every one of the thousands and thousands of compounds works effectively. Yes. But what about the expert testimony that I think we talked about, I mentioned earlier in the day, with your own expert saying that you'd have to test all of these? Yes. So even assuming testing is routine, so was the jury told, yes, we've tested all of these and they all work? On what basis could the jury have concluded that they all work? Because of the mechanics of the two prime methyl up molecule, which attacks the RNA of the virus and causes the chain to terminate. It is that two prime methyl up. That was our invention. That's the thing that causes the chain to terminate. No matter what else is there, that's what causes- Yes. There is evidence in the record of that. Without any screening, no testing, no screening, nothing. Only confirmatory. And that's the word that the patent uses is confirmatory. Now, I think I'm already into my rebuttal time, but I want to be able to make sure that I'm answering the court's questions here because the factual record is so, so critical in this case. Even if I'm wrong, even if it was not reasonable, and I think it was based on the testimony I've given you, for the jury to conclude that Gilead had not met its burden on that particular factual issue. Let me then assume that we're talking about that there are some inoperable embodiments. Well, this court's case law, cases like Atlas Powder, cases like Wands, allow for a number of inoperable embodiments, and they can be screened so long as the screening itself does not constitute undue experimentation. What's the record evidence in this case with regard to 2'-methyl up with activity? It isn't just 2'-methyl up, and this is the problem, and this is the problem that I have. You go through this patent specification, there is no generic formula that includes 2'-methyl up, 2'-meth down. And there's a generic formula for the other halogens down, but they're explicit. They don't mention fluorine, and this is a gap that you have to transcend, I think. Well, it's transcended, I think, by how a person of ordinary skill would, and how a subordinary skilled person of Mr. Clark actually did read the specification. It pointed him right to fluorine. And if it says methyl up, chlorine, fluorine, iodine down, I would say that includes fluorine. But it's just an example. It's an example. And when an example is giving you- Why do they say halogen instead of mentioning 3'-methyl up? We don't know the actual reason. It could have been as simple as a typographical error if that was what was intended. It's in several of the examples. It can't be a typographical error. It is the sort of thing that gets, if you look, the examples are exactly the same. They could have been just cut and pasted. But I don't know that for a fact. What I do know is that the claims include fluoro, and the patent points you to fluoro. Just the last point, Chief Judge Prost, because I want to get to the thing that you're stating concern about here. Let's say I'm wrong and that the jury was not allowed to conclude from the testimony, which is there, that all 2'-methyl up, excuse me, I'm getting myself confused now, compounds work- 2'-methyl. 2'-methyl up. Compounds work against the HCV virus. Let's say I'm wrong about that. Let's take them a look at the testimony about what screening would have been necessary. Other than general comments about you can't know, and of course, the understanding there is for certain, unless you've screened something, because people are talking about making clinical embodiments and getting through the FDA. Here's what Gilead's case was with regard to that. There was a list of 284 2'-methyl up embodiments. That is in the appendix. And I don't, I think it's, I don't have the appendix site for the particular list, but it is the, it is a list that came from our client, from Identix. Dr. Seeger, their expert, put a demonstrative on it. The demonstrative is not part of the record. It's not in our record here. I'm informed that he's cherry-picked 40 inactive compounds from that list of 284. But he only talked about four in the record, and that's A37513 and 514. The only evidence the jury had was that most 2'-methyl up embodiments actually did have activity, or at least hadn't been shown by the party with the burden of proof to have inactivity. He didn't say all 284 don't work. And if you think about this, 40 inactive embodiments, if that's true, that's absolutely accepted as true after a jury considered this record. Out of 284, that is well within what this court allowed in Wands with regard to screening out inoperative embodiments. That case had, depending on the version of the facts that the court accepted, either a 44% hit rate or a 2.8% hit rate, and both were acceptable. Okay. I know I'm into my rebuttal. We're gonna move on. We'll save some time for rebuttal. Let's hear from the other side. Good morning. Good morning, Your Honors. May it please the court. Josh Rosenkranz representing Gilead. Let me go straight to the numbers because that's where a lot of the court's questions were for the first half of Idenix's argument. There are three undisputed legal points, excuse me. There are three undisputed facts that drive the entire enablement case, and by the way, written description, which I don't want to neglect to get to this morning, in our favor. And all of those facts came out of the witnesses of Idenix, and in particular, its experts and Idenix's lawyer's mouths. First, only a small portion of two prime methyl up nucleosides are effective. Second, the field was so unpredictable that you simply could not know, just from looking at a nucleoside, what would be active and what would not. And third, the universe of two prime methyl up nucleosides that would have to be tested was vast. Now let me flesh out the numbers on each of this on the basis of undisputed testimony. So the court asked about the size of the candidate pool. So that's plank one of our argument. And this goes to Judge Prost's initial question. There was never a dispute that the universe of nucleosides- But I thought we got Mr. Castaneda to a point where we were talking about thousands. The district court was tens of thousands. So let's just assume we're in the same universe of numbers. What do you say to his remaining points? Okay, so the next critical question is what proportion of those are active? He's now telling the court a jury could have concluded they were all active. Now I'm surprised to hear this. This was never in dispute. It was actually a key piece of Idenix's argument that the universe of claimed compounds, that is compounds that are active, was actually small. It said, and this is its JMAL opposition at pages three to four, its docket 560, quote, that only a small number of compounds could be active against HCV. But he cited, what do you say to, didn't he give us a transcript site from your witness, Dr. Clark or Mr. Clark? He gave a site from Dr. Clark and from their founder, Somadosi. Both were talking about two prime methyl up, OH down, the compounds that are specifically identified and tested in the patent. Somadosi and Clark said, no question, those are all active. It's four. But Idenix repeats on appeal, their opening brief, page 46, the same point that the universe of active molecules was actually small. And they got that from their own witness. DeFrancesco was an Idenix witness. They teach that the universe is extremely large and on its face, that seems to be the case. My concern is that it's hard to find a generic formula close enough to methyl up, fluorine down. However, it goes all around it. Your friend says the typographical error. I'm not so sure about that. However, it turns out that it is active, just as all these pages of specification say. And so why was the jury wrong in accepting that principle when in fact, actually, it turns out that it's active? Whether it's superior activity or something else, the record doesn't say, but apparently it has something in its favor. Yes, Judge Newman. So two separate questions, and I'll address them separately. You started with the universe. There are two universes we're talking about. There's the universe of potential candidates. Everyone agrees that's huge, and Idenix concedes it's in at least the thousands. Then what proportion, what subset are active, which then triggers the need to do this iterative testing and screening? Idenix now says they were all active. A jury could have found that. Their own witness, and I will quote from Dr. DeFrancesco, their own witness says, quote, this is 37-747. We use the screening because that is a way you actually cut down the number of compounds by removing all inactive ones to a few interesting ones. Idenix's own logs that Mr. Castanis refers to prove the point. Dr. Seeger, whose testimony he mentioned, gave 40 examples of, quote, no activity in BBDV and yellow fever assays. They were not all effective. Now, you asked a separate question about nothing pointing to two prime methyl fluoro. That relates directly to our written description argument, but it also relates to how in the world do you figure out which of these billions or thousands of possible candidates, how do you figure out from the specification which ones are going to work? And that leads to a key legal principle that Idenix has not even discussed this morning. That is, you have to get it from the specification. Well, there is a teaching of a highly specific molecule with thousands of variations. And why isn't it routine just to give a robot the job? Or I'd start at the top, start with page one, make these compounds and see what happens. Well, Your Honor, the answer, I think the easiest way to see the answer is to look at page six of our brief, because it describes what was claimed. And so there is a sugar with six possible variables and then two bases, five more total variables, 11 variables. All that was claimed is, OK, we're going to fix one of those variables at methyl. Start at the top. The undisputed testimony was, even if what you are doing is focusing only on the things that Idenix's own inventor said you would put in place of these question marks, you're talking about billions. So start at the top. It would take forever to test each one of them. And then, to your point, you would never actually test two-prime ethyl fluoro, because the spec points in the other direction. I think that is the strongest argument, that where they do list the halogens, and only some of the examples do they include fluorine. Yes, right. This is not teaching toward. It's teaching away, not in the claim construction sense, but in the sense of not guiding anyone. So it goes both to written description, these are blaze marks in the wrong way, and to what a person of skill in the art would do with these candidates. OK, I want to take you back to your opposing counsel's universe argument. You referenced page 46 of the blue brief. I'm going to take you to the next page, where the appellant says, the district court cited no evidence to support its purely factual determination than a very large number of compounds. This is where I'm bothered about the argument being made. Perhaps thousands, at least many thousands, they're quoting in different quotes, or even millions, satisfied the refined structural limitations. And they say the court cited no evidence for that conclusion. So my question is, is there, in fact, record evidence to support that millions number? And I think part of what you're going to answer me is I just answered that question. But do you have more of that? Well, you gave a part of the answer to that question, but yes, there is more. So first of all, on the structural limitations, their own expert, Dr. Meyer, said that he agreed that if you theoretically went through all of the variables, he was asked this question. Do you agree, this is 37-734, quote, do you agree with the view that we've heard from Gilead side that the 597 patent discloses billions of compounds? He says he agrees, of course, quote, of course, if you discuss all the structures that are mentioned in the 597 patent. So that brings you back to that page I was showing you. All that they did was to fix that one point. Now, he did not create a material dispute of fact by then saying vaguely that the number is significantly smaller. In reality, a person of skill would know it to be smaller for two reasons. First, significantly smaller is still, I mean, billions. That's where he said some of them could be poisonous. Well, no, no, no. He was just talking about activity, not about poisonous. Millions is significantly smaller than billions. It's 1,000 times smaller. Thousands is a million times smaller than billions. And the second reason is he is pointing to a chain of logic that a person of skill in the art would have to adopt, starting with we're focusing on NS5B. OK, so let's pause for a moment. Let's pause it that the person of skill in the art would know that the claim is actually limited to NS5B. The patent doesn't teach you what to do with that. Why it was limited to one target, one actual enzymatic target. But the patent doesn't say the next steps. It doesn't say what you should do with that information is take the OH and replace it with something else. Nor does it tell you the thing you should replace it with is the flora, to Judge Newman's point. It actually points you away from the flora. But the patent makes a powerful contribution on the methyl up substituent. And that's what's claimed. Two prime ethyl doesn't say out there throughout, two time methyl up. Why isn't that enough to cover, as the jury apparently believe, every compound with a two prime ethyl up substituent. Whatever else you put on the two prime down position. Whether or not it's included explicitly in the specification. Well, the answer, Your Honor, is twofold. First, it requires you to go through the iterative process of trying one compound at a time. First, making whatever compound. That's how the system works. But their contribution, their inventive contribution, was the methyl up, two prime methyl up. Yes, Your Honor. Their inventive contribution was a molecule. And by the way, and I would give it to them. They invented a molecule with methyl at two prime up and hydroxy at two prime down and showed that it worked. That did not entitle them to claim every possible compound. Why not? I mean, this is a dilemma. Make an important contribution. It's elaborately explained. Let's agree, it seems to me, that they did not foresee this particular compound, methyl up fluorine down. That it's almost conspicuous in its absence. However, the methyl up seems to be critical. The foundation of their inventive contribution. Your Honor, methyl up was an important contribution from which one then develops. And a normal company would then embark upon a research program to figure out what other changes to the molecule would work. And it might be separately patentable to whoever puts the fluorine down. But in terms of a dominating claim, which seems to be what the jury thought, the methyl up is still there. Your Honor, what they are entitled to is a claim that is commensurate with what they actually discovered. And what they discovered was two prime methyl up works, but only a small portion of molecules with two prime methyl up will work. So now you have to figure out what other changes you're going to make. But I do want to get to this. This segue is directly to the point you were making earlier that goes directly to written description. In some ways, written description is a shortcut to the same result. You don't have to wrestle with how hard it is to make two prime methyl up nucleosides. By the way, that's part of the answer to your question. You've got to make all of these billions or thousands of compounds to use them. You don't have to wrestle with how hard it is to make two prime methyl fluoro. Even whether attaching a fluorine would have been obvious, you don't have to wrestle with. For one version of our written description argument, it doesn't even matter how many viable candidates there were. You can just focus on the spec itself. What does the spec say? Identics possessed four specific nucleosides and thousands of candidates for further research. Whether you think about it in terms of blaze marks or closed lists, you end up in the same place for exactly the reason you articulated, Judge Newman. The list of candidates points away from fluorine at two prime down, not toward it. And identics most certainly did not possess, as in, invent the molecule two prime ethyl fluorine. They omitted it. And identics concedes that they never thought about two prime methyl up fluoro down until a year after the date. Now, there's a clear disconnect to your question, Judge Newman, between the specification and the claim. The patent declares, quote, the present invention is, quote, a nucleoside as described in one of the 18 formulas. Those 18 formulas have very specific constituents. I mean, billions of them. But the universe of nucleosides captured by the formulas, however vast it is, doesn't include the one thing that is actually what the inventors were after. The drug that would actually work. So one thing obviously omitted is two prime fluoro down. The inventors omitted fluorine, a halogen at two prime down, while including all four halogens at two prime up. In fact, even calling it halogens, it had to have been unpurposed. And identics counsel admitted, this is at 25562, why the 597 patent doesn't include two prime fluoro down. Quote, there is no factual dispute that identics' folks only came up with the two prime ethyl fluoro embodiment a year or so after the application was filed. Let me close with just this one minute of framing. And that is, identics is striving to identify disputed facts. But it cannot prevail unless it identifies material disputes of fact. Disputes of fact that will actually change the result. On both undue experimentation and written description, we prevail so long as we persuade this court that the universe of compounds, that is candidate compounds, was at least thousands, which they've conceded. Many of these thousands were ineffective, which they conceded below and even in their brief unappeal. And the patent doesn't teach which ones are effective and which ones are not. The first two points are conceded, so all it comes down to is the patent. Identics never points to anything in the patent that teaches how you separate effective NS5B chain terminators from ineffective ones. It says NS5B, that's it, identics does. But it doesn't tell you what to draw from that. For these reasons, the district court, after a thorough review of the record, came up with the correct conclusion. None of the facts identics points to that it claims are disputed are actual material disputes, and many of them are actually undisputed. If there are no further questions, I thank the court for its attention. We'll restore two minutes, everybody. Thank you, Your Honor. The site I couldn't come up with before to Dr. Goslin's chart is A50155, that's the 284 compounds. We had a jury trial. The jury heard a lot of conflicting evidence in this case. If you just looked at nothing more than the test results, the testimony of our two experts, Dr. DeFrancesco and Dr. Meyer, you'll walk away thinking, how could this judge have taken away this jury verdict? He shouldn't have. What we heard from my friend on the other side was largely summarized at page 38 of his brief. And this, by the way, Judge Prost goes to confirming the point you asked me about Dr. Goslin, the same person who authored that chart, saying you don't know whether a nucleoside will have activity against HCV until you make it and test it. That was not a statement in any way tied to our patent. That was a, by the way, a non-native English speaker put that aside. And that was actually simply a question posed to him by Gilead's counsel, but it wasn't tied to the teachings of the patenteer. We heard my friend talk about the numbers. If you look again at page 38 of their brief, the DeFrancesco testimony about screening, is again also not tied to the patent. It's about screening generally. It doesn't have anything to do with the class of 2'-methyl up ribonucleosides. And in fact, Dr. Meyer's testimony about the unpredictability of a nucleoside's effectiveness was also not tied to our invention. In fact, that same page of the transcript points to the novel aspect and says, quote, there were surprisingly high number of 2'-methyl up compounds that were active. This goes to the point, Judge Newman, that you were making with regard to my friend here during his argument. We made a major contribution here. Our patent enabled commensurate with the scope of our claims. Our contribution was 2'-prime methyl up ribonucleosides and most of them worked. And Chief Judge Prost, this goes to one of the questions that really permeates the court's decisions like the recent one in Enzo, which has been the subject of letter writing earlier this week, predictability. What could a person of ordinary skill in the art predict in light of our patent disclosure? A person of ordinary skill in the art, based on this record, based on the testimony of witnesses, would predict that all, or at worst for my case, most 2'-prime methyl up ribonucleosides would work. If we're in the world of most, that takes us into WANS and Atlas powder where routine ordinary screening doesn't constitute undue experimentation for enablement. With regard to written description, there's a lot of overlap. The judge heard that, said there were factual issues galore on that. But with regard to written description, I just want to point this court out one sentence from the in-bank area decision. The written description requirement, and here I quote, never created a heightened requirement to provide a nucleotide-by-nucleotide recitation of the entire genus of claimed genetic material. It has always permitted the disclosure of structural features common to the members of the genus. We disclosed 2'-prime methyl up ribonucleosides. That's the important structure. That's what we claimed. That's what we enabled. We are entitled to our verdict back. Thank you very much. Thank both sides. And the case is submitted. The next case for argument is 18.